## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIE CUNNINGHAM,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO. _____** |
| | : | |
| **v.** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **YORK COUNTY;** | : | |
| **PRIMECARE MEDICAL, INC.;** | : | |
| **TAMMY CRIST;** | : | |
| **DIANA KNIGHT;** | : | |
| **DOE;** | : | |
| **Defendants.** | : | |

## COMPLAINT

## INTRODUCTION

1.  Plaintiff Willie Cunningham developed appendicitis while he was incarcerated at the York County Prison ("YCP").

2.  Every day for four days he described his increasingly severe abdominal pain to the nurses in YCP's medical department.

3.  During those four days, every nurse that he asked for help failed to provide him with the help that he needed.

4.  The nurses never gave him a physical exam, palpated his abdomen, or consulted with a medical supervisor regarding Mr. Cunningham's persistent abdominal pain. They never even took his vital signs.

5.     When YCP staff finally took Mr. Cunningham to the hospital, his appendix had already ruptured. He had two large abscesses in his abdomen, gangrene, peritonitis, and sepsis with acute kidney failure.

6.     Mr. Cunningham spent a month in the hospital, in pain and believing that he was going to die. After he was discharged from the hospital, it took three months of convalescence before he was strong enough to comfortably walk a distance of a few blocks.

7.     As a result of the acts and omissions of the Defendants, Mr. Cunningham faces a lifetime of gastrointestinal problems, along with an increased risk for rehospitalization, recurrent infections, and chronic illness.

8.     The nurses' repeated failures to examine Mr. Cunningham or consult with a supervisor and the significant delay in sending Mr. Cunningham to the hospital were consistent with an established pattern in the medical department at YCP.  York County and its medical provider, PrimeCare Medical, Inc., were aware of recurring problems with YCP medical practitioners' response to serious medical conditions like Mr. Cunningham's. But for years, they, with deliberate indifference, failed to take action to remedy those problems.

9.     Mr. Cunningham brings this action for damages against York County, PrimeCare Medical, Inc., and various medical staff at YCP for depriving him of his

2

rights guaranteed by the Fourteenth Amendment of the United States Constitution and Pennsylvania law.

## JURISDICTION AND VENUE

10. Plaintiff brings this action pursuant to 42 U.S.C. § 1983. The Court, therefore, has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

11. The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) to adjudicate Plaintiff's state law claims.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to the claims occurred in York County, Pennsylvania, which is in the Middle District of Pennsylvania.

## PARTIES

13. Plaintiff Willie Cunningham, a 59-year-old man, is currently incarcerated within the Pennsylvania Department of Corrections and was incarcerated at YCP in December 2023 when the acts and omissions giving rise to this complaint occurred.

14. Defendant York County is a municipal government entity in the Commonwealth of Pennsylvania, which owns and operates the York County Prison, 3400 Concord Road, York, Pennsylvania 17402.

15. Defendant PrimeCare Medical, Inc. ("PrimeCare"), which has a principal place of business at 3940 Locust Lane, Harrisburg, PA 17109, was, at all

3

times relevant to this case, the holder of a contract with York County to provide medical care to people incarcerated at YCP.

16. Defendant Tammy Crist worked at YCP as the Assistant Director of Nursing during all times relevant to this case, and, upon information and belief, she was an employee of PrimeCare. She has been licensed as a Registered Nurse by the Pennsylvania Board of Nursing since 2020.

17. Defendant Diana Knight worked at YCP as a nurse during all times relevant to this case, and, upon information and belief, she was an employee of PrimeCare. She has been licensed as a Registered Nurse by the Pennsylvania Board of Nursing since 2011.

18. Defendant Doe worked at YCP as a nurse or other medical professional during all times relevant to this case and, upon information and belief, she was an employee of PrimeCare.

## STATEMENT OF FACTS

### PrimeCare Medical Staff Ignored Mr. Cunningham's Appendicitis for Four Days

19. Mr. Cunningham was a pretrial detainee at YCP in 2023, including during the month of December 2023.

20. On or around December 16, 2023, he began feeling ill. Over the next two days he experienced increasing abdominal pain, nausea, and general fatigue and weakness.

4

21. On the morning of December 18, 2023, he attempted to do his assigned work, including sweeping, mopping, and serving food to other incarcerated people.

22. Corrections Officer Simpson, the corrections officer on duty that morning, noticed that Mr. Cunningham "looked terrible" and told him to take the day off from work.

23. Mr. Cunningham went back to bed and stayed there for the rest of the day. He had difficulty eating and drinking.

24. On the evening of December 18, 2023, his abdominal pain increased and he vomited three times.

25. YCP's Procedure's Manual Section D, "Medical Services," specifies that staff members can determine that an incarcerated person is experiencing a medical emergency that requires medical services.

26. At or around 11:00 p.m., the corrections officer on duty called YCP's medical department and then took Mr. Cunningham to YCP's medical department.

27. During the walk from his housing unit to the medical unit, a distance that would have ordinarily taken Mr. Cunningham a couple of minutes to complete, Mr. Cunningham had to stop twice to rest.

28. His abdominal pain was so severe that he was unable to stand upright as he walked.

29.    When he arrived at the medical department, Mr. Cunningham described his symptoms to Defendant Crist.

30.    Appendicitis is one of the most common causes of acute abdominal pain.[1]

31.    Any competent medical professional would be aware that the standard of care dictates that a patient presenting with acute abdominal pain should receive a physical exam, including measurement of vital signs and palpation of the abdomen.[2]

32.    Defendant Crist did not perform a physical exam on Mr. Cunningham or palpate his abdomen.

33.    Defendant Crist did not measure Mr. Cunningham's temperature, blood pressure, pulse, or respirations.

34.    Defendant Crist told Mr. Cunningham that he had heartburn and gave him Pepto-Bismol and antacid tablets.

35.    Defendant Crist falsely recorded in Mr. Cunningham's medical record that Mr. Cunningham had eaten his supper on December 18, 2023 and that she palpated his abdomen and measured his blood pressure, pulse, respirations, and temperature during the December 18, 2023 encounter.

---

[1] Matthew Snyder, Marjorie Guthrie & Stephen Cagle, *Acute Appendicitis: Efficient Diagnosis and Management,* 98(1) AM. FAM. PHYSICIAN 25 (2018), https://www.aafp.org/pubs/afp/issues/2018/0701/p25.html [https://perma.cc/ELR9-UM4R].

[2] *See id.* at 25-26.

36.    Defendant Crist failed to note in Mr. Cunningham's medical record that his abdominal pain had been ongoing since December 16, 2023.

37.    Any competent medical professional would be aware that entering false information and omitting the duration of an important symptom from a patient's medical record creates a significant risk of misdiagnosis and harm.

38.    That night Mr. Cunningham continued to experience extreme abdominal pain and nausea.

39.    He was unable to sleep and repeatedly tried to make himself vomit in an attempt to relieve the pain.

40.    On the morning of December 19, 2023, Mr. Cunningham's shirt, shorts, and bed sheets were soaked in sweat.

41.    At or around 6:00 a.m. on December 19, 2023, the corrections officer on duty called YCP's medical department and then took Mr. Cunningham to YCP's medical department.

42.    Mr. Cunningham was again unable to walk upright and had to rest at least twice while walking from his unit to the medical department.

43.    When he reached the medical department, Mr. Cunningham attempted to explain his symptoms to Defendant Knight, including that he had been experiencing abdominal pain for three days, his abdominal pain had sharply increased the previous day, and he had experienced night sweats and nausea.

7

44.    Defendant Knight did not perform a physical exam on Mr. Cunningham or palpate his abdomen.

45.    Defendant Knight did not measure Mr. Cunningham's temperature, blood pressure, pulse, or respirations.

46.    She told Mr. Cunningham that he had a stomach virus that would go away after a few days and gave him a dose of anti-nausea medication.

47.    Defendant Knight falsely recorded in Mr. Cunningham's medical record that she measured his blood pressure, pulse, respirations, and temperature during the December 19, 2023 encounter.

48.    Defendant Knight did not note the date of onset and/or duration of Mr. Cunningham's abdominal pain.

49.    Mr. Cunningham stayed in his bed the rest of the day.

50.    Other incarcerated people attempted to care for him, including by bringing him fresh sheets for his bed, making him soup, and encouraging him to drink water, but Mr. Cunningham was unable to eat, drink, or sleep because of his extreme pain.

51.    On the morning of December 20, 2023, a corrections officer again called the medical department and then took Mr. Cunningham to YCP's medical department.

8

52. This was the third attempt by Mr. Cunningham and corrections staff to obtain medical care for his abdominal pain.

53. Mr. Cunningham again explained his symptoms to Defendant Knight, including his extreme abdominal pain.

54. The standard of care dictates that when a patient presents repeatedly with the same symptoms, a nurse should consult with a supervising medical professional.

55. Defendant Knight did not consult with her supervisor regarding Mr. Cunningham's ongoing abdominal pain.

56. Defendant Knight again failed to provide Mr. Cunningham with a physical exam, palpate his abdomen, or measure his blood pressure, pulse, respirations, or temperature.

57. She sent Mr. Cunningham back to his housing unit without providing medical treatment or instructions to him, noting only that he was approved for one additional day off from work.

58. Defendant Knight failed to note any of Mr. Cunningham's symptoms in his medical record, including the date of onset and/or duration of his abdominal pain.

59. Throughout December 20, 2023, Mr. Cunningham again stayed in bed, in extreme pain and unable to eat, drink, or sleep.

60. In a fourth attempt to obtain medical care for Mr. Cunningham, on the morning of December 21, 2023, a corrections officer called YCP's medical department and then took Mr. Cunningham to the medical department.

61. Mr. Cunningham explained his symptoms to Defendant Doe, including his abdominal pain.

62. Defendant Doe did not perform a physical exam on Mr. Cunningham or palpate his abdomen.

63. Defendant Doe did not measure Mr. Cunningham's temperature, blood pressure, pulse, or respirations.

64. Defendant Doe did not consult with her supervisor regarding Mr. Cunningham's ongoing abdominal pain.

65. She sent Mr. Cunningham back to his housing unit without providing medical treatment or instructions to him.

66. The version of PrimeCare's healthcare record-keeping policy then in effect, "Health Records, J-A-08," required that "[a]ll clinical encounters, whether occurring inside or outside the facility, must be recorded in the health record."

67. Defendant Doe did not make any entry in Mr. Cunningham's medical record regarding his December 21, 2023 visit to YCP's medical department.

68. Throughout December 21, 2023, Mr. Cunningham's health continued to deteriorate.

69. On the morning of December 22, 2023, Mr. Cunningham made a fifth attempt to obtain medical care.

70. After six days of abdominal pain, nausea, diarrhea, and minimal food and water, Mr. Cunningham was barely able to walk to YCP's medical department.

71. The nurses on duty that day, Debra Ison, a Registered Nurse, and Aba Fahnbulleh, a Certified Registered Nurse Practitioner, had not previously been involved with Mr. Cunningham's attempts to obtain medical care.

72. When Ms. Ison and Ms. Fahnbulleh saw Mr. Cunningham, they immediately identified his need for emergency care and sent him to York County Hospital.

73. Ms. Ison and Ms. Fahnbulleh entered false information into Mr. Cunningham's medical record purporting to have measured his blood pressure, pulse, respirations, and temperature during the December 22, 2023 encounter.

74. Ms. Fahnbulleh entered false information into Mr. Cunningham's medical record purporting to have conducted a physical examination during the December 22, 2023 encounter.

**PrimeCare Medical Staff Caused Mr. Cunningham Significant Harm**

75.    If appendicitis is diagnosed and treated soon after a patient begins experiencing symptoms, recovery is expected within 24 to 48 hours.[3]

76.    Appendicitis is typically treated with an appendectomy, the surgical removal of the appendix.[4]

77.    Patients who receive an appendectomy are typically discharged from the hospital the day after the surgery, or sometimes even the same day.[5]

78.    Depending on the surgical method and size of the abdominal incision, patients typically resume all normal physical activities within 3 to 14 days after surgery.[6]

---

[3] Saran Lotfollahzadeh, Richard A. Lopez & Jeffrey G. Deppen, *Appendicitis*, STATPEARLS [INTERNET] (last updated Feb. 12, 2024), https://www.ncbi.nlm.nih.gov/books/NBK493193/ [https://perma.cc/643J-VKU9] (last visited Oct. 27, 2025).

[4] *Treatment for Appendicitis*, NAT'L INST. OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES (last reviewed July 2021), https://www.niddk.nih.gov/health-information/digestive-diseases/appendicitis/treatment [https://perma.cc/K7MS-6SA9] (last visited Oct. 27, 2025).

[5] *Appendectomy*, AMERICAN COLLEGE OF SURGEONS, https://www.facs.org/for-patients/the-day-of-your-surgery/appendectomy/ [https://perma.cc/4RXZ-SVU5] (last visited Oct. 27, 2025); Elisabeth M.L. de Wijkerslooth et al., *Same-Day Discharge After Appendectomy for Acute Appendicitis: A Systematic Review and Meta-Analysis*, 36(6) INT'L J. COLORECTAL DISEASE 1297 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8119270/ [https://perma.cc/52ZV-TTUD].

[6] *Treatment for Appendicitis, supra* note 4.

79.    If diagnosis and treatment of appendicitis are delayed, possible risks include perforation of the appendix, abscesses, peritonitis, sepsis, and death.[7]

80.    Peritonitis is a serious condition characterized by severe abdominal inflammation, frequently as a result of a bacterial infection.[8]

81.    Defendants' failure to palpate Mr. Cunningham's abdomen, take his vital signs, consult with a supervising medical professional, proactively monitor his physical condition, and maintain an accurate record of the duration and severity of his abdominal pain and accompanying symptoms, along with the inclusion of false information in Mr. Cunningham's medical record, significantly delayed the diagnosis and treatment of his appendicitis.

82.    When Mr. Cunningham arrived at York County Hospital, medical staff diagnosed him with a perforated appendix with abscesses, gangrene, peritonitis, and sepsis with acute kidney failure.

83.    The severity of Mr. Cunningham's medical condition upon his arrival at York County Hospital necessitated a month-long hospital stay.

84.    For much of that month, he believed that he was going to die.

---

[7] Lotfollahzadeh, *supra* note 3.

[8] *Peritonitis,* CLEVELAND CLINIC (last reviewed 7/29/25), https://my.clevelandclinic.org/health/diseases/17831-peritonitis [https://perma.cc/UZZ8-ZX8U].

85. For several days he was only vaguely aware of what was going on around him, unable to carry on a conversation or watch television.

86. He required two surgeries to clean out the infection in his abdomen, along with additional non-surgical procedures to drain pus from his abdomen.

87. During the second surgery, the surgeon placed two drains in his abdomen to allow for ongoing evacuation of pus and fluid.

88. Approximately ten days after his arrival, staff placed a catheter in his arm to deliver nutrition to him because he was malnourished from his inability to eat.

89. On one occasion while he was semi-conscious, he heard medical staff say that they did not know how he was still alive.

90. Mr. Cunningham was discharged from York County Hospital on January 21, 2024, with one drain still in his abdomen.

91. He was still experiencing significant pain from his abdominal surgeries, needed a walker for distances of more than a few steps, and required assistance with basic self-care.

92. Because he had been granted bail during the time that he was in the hospital, his mother, Sara Simon, took him into her home.

93.    Ms. Simon is a 75-year-old retiree with health conditions that cause her to become short of breath and to experience intermittent numbness in her legs when she exerts herself.

94.    Ms. Simon lives on a limited income in a small rental house with no bathroom or bedroom on the first floor.

95.    Mr. Cunningham slept on a couch on the first floor. When he needed to use the bathroom, he had to call his mother to help him climb the stairs.

96.    Because Mr. Cunningham could not afford to pay for the visiting nurse service recommended by his medical team, his mother asked the nurses at the hospital to teach her how to care for him.

97.    For several days, Ms. Simon changed Mr. Cunningham's abdominal dressings at least twice a day, which included replacing the bag attached to his abdominal drain, cleaning the surgical incisions, and rebandaging his abdomen.

98.    Mr. Cunningham had to rely on his mother for several weeks to help him with basic self-care, including cooking him soft, bland food, changing his sheets twice a day, and driving him to his medical appointments.

99.     Sepsis survivors have a decreased quality of life and shorter life expectancy and are at increased risk for rehospitalization, recurrent infections, and chronic illness, including cardiac problems.[9]

100.    Many sepsis survivors continue to experience fatigue and muscle weakness for months after hospitalization.[10]

101.    Some sepsis survivors experience permanent cognitive impairment, including memory loss, and mental health problems such as anxiety, depression, and sleep disturbances.[11]

102.    For several weeks after his discharge from the hospital, Mr. Cunningham continued to experience pain and general lethargy.

103.    He seldom left his mother's home except to go to medical appointments.

104.    When he felt well enough to go out, he had to practice walking, building up his endurance by walking an additional half-block or block at a time.

---

[9] Elisabeth C. van der Slikke et al., *Understanding Post-Sepsis Syndrome: How Can Clinicians Help?*, 16 INFECTION AND DRUG RESISTANCE 6493, 6497-6500 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10546999/ [https://perma.cc/6K77-WMZY].

[10] *Id.* at 6497.

[11] *Id.* at 6501.

105.   It took him until spring 2024, at least three months after he was discharged from the hospital, to feel well enough to walk 2 ½ blocks to the corner store and enjoy a meal out with a friend.

106.   He has both internal and external scarring on his abdomen from the infection and surgeries.

107.   He continues to have abdominal pain at least one to two times per week and often sweats heavily in the early morning, dampening his bedsheets.

108.   He also has ongoing gastrointestinal issues, including frequent diarrhea that sometimes causes him to soil himself.

109.   In December 2024, he had abdominal pain so severe that it necessitated emergency medical care at York County Hospital.

110.   Every time he touches the scars and knots on his abdomen, he remembers the days he spent fearing death and the months of suffering and weakness.

111.   Defendants' callous disregard for his life has made it more difficult for him to trust the people around him and he now finds it more difficult to socialize and has periodic bouts of anxiety and depression.

**York County's and PrimeCare's Deficient Practices and Lack of Supervision
Caused Mr. Cunningham Significant Harm**

112. For almost twenty years, Defendant York County entered into multiple successive contracts with Defendant PrimeCare that granted PrimeCare the exclusive right to provide medical services to incarcerated people at YCP.

113. Most recently, Defendants York County and PrimeCare entered into a contract for a three-year period that lasted from 2022-2025 ("Contract").

114. The Contract provided that York County would pay to PrimeCare an annual fee for its provision of medical services and that PrimeCare would be responsible for all costs, up to a limit for catastrophic cases, for incarcerated people who required off-site medical services, including hospitalization for serious illnesses.

115. YCP has a small medical department that lacks an infirmary.

116. Many prisons and jails use infirmary care to monitor patients presenting with symptoms and medical conditions that warrant medical observation.

117. PrimeCare's "Infirmary-Level Care" policy, "YCP J-F-02," specifies that PrimeCare "does not provide care which meets the definition of infirmary care."

118. YCP J-F-02 states that "[p]atients that require skilled or acute services are referred to outside facilities specializing in the appropriate level of care required by the patient."

119. Under the Contract, an expenditure of funds for an incarcerated person's hospitalization or off-site medical services reduced PrimeCare's annual profits.

120. In the past several years, medical professionals at YCP have repeatedly been sued in multiple federal civil rights lawsuits based on allegations that they, among other things, failed to properly care for incarcerated people presenting with signs of serious medical conditions and failed to seek off-site medical treatment for individuals whose conditions could not be adequately treated at YCP.

121. Those cases include the following litigated in the Middle District of Pennsylvania:

    a. *Dixon v. York County, et al.*, No. 1:25-cv-01214, in which the plaintiff's estate alleged that during a 29-hour period, plaintiff visited the medical unit seven times, did not receive adequate care for his complaints of feeling "sick and nauseous," and died approximately two hours after medical staff examined him and failed to identify him as being at high medical risk;

    b. *Colon-Santiago v. PrimeCare, Inc. et al.*, No. 1:25-cv-00966, in which the plaintiff alleged that a nurse incorrectly administered an injection, causing him to suffer damage at the injection site, and subsequently failed to adequately treat the injury such that it became infected,

requiring months of treatment and resulting in nerve damage and scarring;

c. *Kennedy v. Primecare Medical, Inc., et al.*, No. 1:24-cv-00841, in which the plaintiff alleged that medical staff ignored multiple attempts on his part to seek care for his visibly broken foot, leading to permanent deformation, pain, and arthritis;

d. *Hengst v. Primecare Medical, Inc., et al.*, No. 3:20-cv-02023, in which the plaintiff alleged that medical staff failed to provide adequate medical care over a period of several days for his broken ankle, causing him to suffer significant pain and delayed recovery;

e. *Palmer v. York County, et al.*, No. 1:20-cv-539, in which the plaintiff's estate alleged that multiple medical professionals at York County Prison were aware of plaintiff's deteriorating mental state and urgent need for medical care in the hours prior to his death, but took no action;

f. *Ornstein v. Warden, et al.*, No. 3:18-cv-02042, in which the plaintiff alleged that he experienced internal bleeding for six days while medical staff ignored his increasingly urgent requests for help, resulting in him lapsing into unconsciousness and requiring two weeks of care in the critical care unit of the local hospital.

20

122. Prior to the events at issue in this case, Defendants York County and PrimeCare were aware of the inadequate care provided by medical professionals at YCP as described in the above cases and failed to remedy the deficiencies in employee performance that led to such inadequate care.

123. Further, Defendants York County and PrimeCare have failed to remedy a contractual arrangement that provides a financial disincentive for Defendant PrimeCare to send incarcerated people with serious medical needs for off-site medical services.

124. Even now, medical staff at YCP continue to ignore the needs of incarcerated people presenting with serious medical conditions and to avoid seeking off-site medical treatment for individuals whose conditions cannot be adequately treated at YCP.

125. In October 2025, while he was incarcerated at YCP, MCF broke a bone in his wrist, causing immediate and visible swelling and leaving him unable to move his wrist.

126. Although York County ended its contract with PrimeCare effective October 1, 2025 and instead entered into a similar contract with Mediko, most of

YCP's former PrimeCare employees were hired by Mediko and are still providing medical care at YCP.[12]

127.   When MCF sought medical care for his broken wrist, medical staff at YCP gave him an ice pack and told him that he would need to wait five days for any additional treatment because of medical staffing schedules.

128.   The day after the injury, a corrections officer noticed the substantial swelling of MCF's wrist, his inability to move his wrist, and his significant pain and called YCP's medical department to request medical care on his behalf.

129.   YCP's medical staff repeatedly refused to see MCF, telling the corrections officer that MCF would need to wait for care. It took multiple phone calls by the corrections officer to get medical staff to examine MCF and send him off-site for treatment.

130.   Prior to the events at issue in this case, Defendants York County and PrimeCare knew that medical professionals at YCP, and Defendant Knight in particular, had a practice of ignoring urgent medical situations and falsifying medical

---

[12] *See* Anthony Maenza, *Prison Health Care Workers Being Laid Off Will Be Offered Positions With New Company,* YORK DISPATCH (Aug. 16, 2025, at 09:39 ET) https://www.yorkdispatch.com/story/news/local/2025/08/16/health-care-workers-being-offered-positions-with-new-prison-provider/85688787007/?gnt-cfr=1&gca-cat=p&gca-uir=true&gca-epti=z115344p000750c000750d00----v115344b0053xxd005365&gca-ft=252&gca-ds=sophi [https://perma.cc/76MS-SE82] (referencing the statement of Mediko's CEO that "his company values the knowledge and expertise the current employees bring to the table at York County Prison").

record entries in ways that created a significant risk of misdiagnosis and harm, but neither York County nor PrimeCare took action to correct those practices.

131.    In *Palmer v. York County, et al.,* Mr. Palmer's estate alleged that surveillance video of Defendant Knight showed her providing a "wellness check" of Mr. Palmer that consisted of her looking into the window in his cell door for eight seconds.[13]

132.    Defendant Knight noted in Mr. Palmer's medical chart that at the time she conducted the wellness check, Mr. Palmer was "lying on bunk, respirations observe [sic], no complaints voiced."[14]

133.    In direct contradiction of Defendant Knight's medical chart entry, surveillance video of Mr. Palmer at the time of Defendant Knight's wellness check showed him lying on the floor of his cell, face down, naked, and unconscious.[15]

134.    Upon information and belief, in 2023, PrimeCare's medical staffing at YCP included no more than twelve staff positions for registered nurses and certified registered nurse practitioners.

---

[13] Second Amended Complaint, *Palmer v. York County et al.,* No. 1:20-cv-539 (M.D. Pa. Mar. 15, 2021), ECF No. 83, ¶¶ 41-44.
[14] *Id.* ¶ 45.
[15] *Id.* ¶ 46.

135. During Mr. Cuningham's attempts to get medical care for his abdominal pain, he saw five of YCP's medical staff—Defendants Crist, Knight, and Doe, and nurses Ison and Fahnbulleh.

136. Four of the five medical staff members entered false information in Mr. Cunningham's medical record, and the fifth, Defendant Doe, entered no information whatsoever.

137. Three of the five medical staff members ignored and mischaracterized Mr. Cunningham's serious medical condition.

138. All five of the medical staff members failed to perform even the most basic diagnostic tasks such as measuring vital signs and performing a physical exam.

139. As described in the above cases and evidenced by the widespread deficiencies in the care Mr. Cunningham received, Defendants York County and PrimeCare had a custom of cutting corners, ignoring, dismissing and/or failing to properly respond to the needs of incarcerated people presenting with serious medical conditions and of maintaining false and incomplete medical records.

140. As described in the above cases and evidenced by the widespread deficiencies in the care Mr. Cunningham received, Defendants York County and PrimeCare, with deliberate indifference, failed to develop and implement policies, practices, and procedures so as to ensure that incarcerated people would receive adequate treatment for serious medical needs.

141. As described in the above cases and evidenced by the widespread deficiencies in the care Mr. Cunningham received, Defendants York County and PrimeCare, with deliberate indifference, failed to ensure proper training, supervision, and discipline for PrimeCare employees so as to ensure that incarcerated people would receive adequate treatment for serious medical needs.

**CAUSES OF ACTION**

**Count I: 42 U.S.C. § 1983 – Fourteenth Amendment**
**Plaintiff v. Defendants Crist, Knight, and Doe**

142. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

143. Defendants' acts and/or omissions were objectively unreasonable, not rationally related to any legitimate purpose, and exhibited deliberate indifference to Mr. Cunningham's serious medical needs and a substantial risk of serious harm, including premature, preventable death.

144. Defendants' acts and/or omissions caused Mr. Cunningham to develop abdominal abscesses, gangrene, peritonitis, and sepsis with acute kidney failure, causing him unnecessary pain and suffering and long-term health consequences, and placing him at risk of death.

## Count II: 42 U.S.C. § 1983 – Fourteenth Amendment
### Plaintiff v. Defendants York County and PrimeCare

145. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

146. At all relevant times, Defendant York County had a non-delegable duty to provide adequate medical care to individuals incarcerated in York County Prison and is therefore liable for any violations of Mr. Cunningham's rights caused by PrimeCare's policies or customs.

147. Defendants York County and PrimeCare have a widespread and well-settled custom of ignoring, dismissing and/or failing to properly respond to the needs of incarcerated people presenting with serious medical conditions and of maintaining false and incomplete medical records in a manner that creates a significant risk of misdiagnosis and harm.

148. Defendants York County and PrimeCare have, with deliberate indifference, failed to establish policies, practices, and procedures and/or have failed to properly train, supervise, and discipline their employees regarding the provision of adequate medical care to incarcerated people with serious medical needs.

149. The violations of Mr. Cunningham's constitutional rights under the Fourteenth Amendment to the United States Constitution, his damages, and the conduct of the individual defendants were directly and proximately caused by the actions and/or inactions of Defendants York County and PrimeCare.

### Count III: Professional Negligence and Vicarious Liability
### under Pennsylvania Law
### Plaintiff v. Crist, Knight, Doe, and PrimeCare

150. The allegations set forth in each of the preceding paragraphs are incorporated herein by reference.

151. At all relevant times, the individual Defendants had a duty to act in accordance with the standard of care required of medical professionals and to act as a reasonable person would under the same or similar circumstances.

152. Defendant Crist breached her duty as a nurse when she failed to provide adequate medical care to Mr. Cunningham, including her failure to respond appropriately to his symptoms, conduct a physical exam, and measure his vital signs.

153. Defendants Knight and Doe breached their duty as nurses when they failed to provide adequate medical care to Mr. Cunningham, including their failure to respond appropriately to his symptoms, conduct a physical exam, measure his vital signs, and consult with a supervising medical professional.

154. As a result of the individual Defendants' acts and omissions, Mr. Cunningham developed abdominal abscesses, gangrene, peritonitis, and sepsis with acute kidney failure, causing him unnecessary pain and suffering and long-term health consequences, and placing him at risk of death.

155. Defendant PrimeCare Medical, Inc. is vicariously liable for the negligence of its employees, Defendants Crist, Knight, and Doe.

## REQUESTED RELIEF

WHEREFORE, Plaintiff Willie Cunningham respectfully requests that the Court grant the following relief:

A.    An award of compensatory damages against all Defendants in an amount to be determined by the finder of fact;

B.    An award of punitive damages against all Defendants except for York County;

C.    Reasonable attorney's fees and costs; and

D.    Such other relief the Court deems just and proper.

Respectfully submitted,

*/s/ Evangeline Wright*
Evangeline Wright (PA 200054)
PA INSTITUTIONAL LAW PROJECT
115 Farley Circle, Suite 110
Lewisburg, PA 17837
570-661-9044
ewright@pilp.org

*Counsel for Plaintiff*

DATE:    November 14, 2025